# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

JOAN GOODWINE and JOSEPH            :
CARDILLO,                           :
                                    :
       Plaintiffs,               :
                                    :
v.                                  :     No. 3:08cv532 (MRK)
                                    :
CONNECTICUT DEPARTMENT              :
OF CHILDREN AND FAMILIES,           :
JEANETTE PEREZ, JEANNE GAVEY,       :
BRYAN BENDIG, JOHN MATTERA          :
and JOHN SULLIVAN,                  :
                                    :
       Defendants.               :

## MEMORANDUM OF DECISION

Plaintiffs Joan Goodwine and Joseph Cardillo have sued the Connecticut Department of

Children and Families ("DCF"), which employed Ms. Goodwine and Mr. Cardillo at all times

relevant to this action.  They also have sued other individuals employed by DCF ("the individual

Defendants").  Currently pending is Defendants' Motion for Summary Judgment [doc. # 86] on

five of the Plaintiffs' remaining claims, including all the remaining federal law claims in this

case.

The First Count of Plaintiffs' Second Amended Complaint ("Complaint") [doc. # 47] is a

claim brought pursuant to 42 U.S.C. § 1983, and it alleges that the individual Defendants

discriminated against Ms. Goodwine on the basis of her race and gender.[1]  The Second Count,

---

[1] In the Complaint, Plaintiffs label the First Count "42 USC § 1983 AS TO THE INDIVIDUAL
DEFENDANTS," but do not indicate which federal constitutional or statutory right forms the
basis for that § 1983 claim.  At oral argument, Plaintiffs' counsel stated that the First Count
asserts an equal protection claim.

asserted on behalf of Ms. Goodwine, alleges disparate treatment on the basis of race and gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"). The Third Count asserts a Title VII hostile work environment claim on behalf of Ms. Goodwine. The Fourth Count is a claim brought pursuant to 42 U.S.C. § 1983 and alleges that some of the individual Defendants retaliated against Mr. Cardillo because Mr. Cardillo "engag[ed] in actions to protect the rights of [Ms.] Goodwine." Second Amended Compl. [doc. # 47] at 14-15, ¶ 64. The Fifth Count alleges that DCF retaliated against Mr. Cardillo in violation of Title VII "for his actions taken to protect [Ms.] Goodwine." *Id.* at 15, ¶ 67. The Sixth Count is a state law trespass-against-the-person claim asserted against Defendant Bryan Bendig only. Although Defendants have not argued for summary judgment on that claim, they do request that the Court decline to exercise supplemental jurisdiction over the claim should the Court decide to dismiss all of the Plaintiffs' federal claims.

For the reasons that follow, the Court GRANTS Defendants' Motion for Summary Judgment [doc. # 86].

## I.

The following facts are drawn from the record before the Court; unless otherwise noted, they are undisputed. Additional facts may be introduced below as needed to address individual claims.

Plaintiff Joan Goodwine is an African-American female who since 1997 has been employed as an Instructional Assistant at Connecticut Juvenile Training School ("CJTS"), a DCF-run school for juveniles who have been committed to the custody of the State for a variety of reasons. Plaintiff Joseph Cardillo was an Instructional Assistant at the school until February 2007, when he left his position due to a workplace injury. At all times relevant to this action,

Mr. Cardillo was also a union steward with Local 318. Mr. Cardillo eventually retired from State employment in May 2009. Until June 2008, Defendant Bryan Bendig was a science teacher at CJTS. Defendants Jeanne Gavey and Jeannette Perez are DCF "Central Office" Human Resources employees who are assigned to handle human resources and labor relations issues for DCF. Defendant John Sullivan is Superintendant of Schools at DCF. Defendant John Mattera is the principal of the Cady School, the school within CJTS where Ms. Goodwine, Mr. Cardillo, and Mr. Bendig worked.

On Friday, December 22, 2006, Ms. Goodwine had an encounter with Mr. Bendig. Defendants claim that Mr. Bendig "touched Ms. Goodwine on the head without her consent and made a remark to her that [Ms. Goodwine] found offensive." Defs.' Local R. 56(a)1 Statement [doc. # 86-2] ¶ 8. However, Ms. Goodwine asserts that Mr. Bendig "approached Ms. Goodwine with stealth . . . struck her on the head, so that she suffered an immediate headache which lasted several days," and that Mr. Bendig threatened to "kick [her] ass." Pls.' Local R. 56(a)2 Statement [doc. # 99-3]; Goodwine Aff. [doc. # 99-2] ¶ 5. Ms. Goodwine first reported the incident on December 26, to Barbara Mule, a department head at the school. Ms. Mule advised Ms. Goodwine that she should report the incident to Mr. Mattera, who was scheduled to be back at work the following day.

On December 27, Ms. Goodwine reported the incident to Mr. Mattera while Mr. Mattera was in Ms. Mule's office. After hearing what happened, Mr. Mattera stated "this is serious." Mr. Mattera then phoned Ms. Gavey at Human Resources to report the incident. On December 28, at 8:00 a.m., Ms. Gavey called Ms. Goodwine at home, and then called Morgan Castillo, another Human Resources employee. Ms. Castillo then spoke to Ms. Goodwine and completed a workplace violence report for Ms. Goodwine that day. During her conversations with Human

Resources on December 28, Ms. Goodwine reported that in the summer and fall of 2006, Mr. Bendig had more than once called her "goodswine" while passing her in the hallway, and that on one day during the same period, Mr. Bendig had made two comments about another employee being able to "kick [Ms. Goodwine's] ass." On December 28, as a result of Ms. Goodwine's report, Mr. Bendig was placed on paid administrative leave.

On January 4, 2007, Ms. Gavey met with Bryan Bendig and his union representative. Ms. Gavey then conferred with her superiors, Ms. Perez and Wanda Estrella, as well as the Cady School management, Mr. Mattera, and Mr. Sullivan regarding the facts she had gathered and the appropriate level of discipline to impose. Human Resources recommended a five-day suspension without pay, and the school management concurred. On January 16, 2007, DCF held a hearing pursuant to *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985), to assess the allegations against Mr. Bendig, and ultimately suspended Mr. Bendig for five days without pay, as recommended by Human Resources.[2] Mr. Bendig returned from his five-day suspension on February 1, 2007. After Mr. Bendig returned from his five-day suspension, Ms. Goodwine and Mr. Bendig were never again assigned to the same classroom, and their interactions were limited to passing each other in the hallway and occasions when Mr. Bendig phoned the library and Ms. Goodwine answered.

On January 22, 2007, Mr. Cardillo returned from a worker's compensation leave. In his capacity as union steward, Mr. Cardillo began inquiring with Mr. Mattera and Ms. Gavey regarding the incident between Ms. Goodwine and Mr. Bendig. On or around January 30, 2007, Mr. Cardillo filed several grievances with DCF on behalf of Ms. Goodwine. None of those

_____

[2] An Office of Labor Relations ("OLR") arbitrator later overturned that discipline, and reinstated Mr. Bendig's five days of pay.

grievances mentioned discrimination on the basis of race or sex.  Rather, they alleged that Ms.

Goodwine had been a victim of workplace violence, that DCF had failed to comply with agency

standards and the agency's workplace violence policy in its response to Ms. Goodwine's

complaint, and that DCF was also in violation of state anti-bullying legislation.  *See* Ex. 10 to

Mot. for Summary J. [doc. # 86-13].[3]  On February 16, 2007, Ms. Goodwine filed an Affirmative

Action Complaint with DCF's Division of Diversity and Equity.  *See* Affirmative Action Compl.,

Ex. 12 to Mot. for Summary Judgment [doc. # 86-15]; Pls.' Local R. 56(a)(2) Statement [doc.

# 99-3] at 65.[4]

  After Mr. Cardillo returned to work in January 2007, he was assigned to a unit in

Building 6 at the school.  The parties dispute the reason for Mr. Cardillo's assignment to

Building 6, as well as the timing of that assignment.  Defendants claim that Mr. Cardillo was

assigned to Building 6 "[t]he first week [he] returned . . . because there was a need there for an

Instructional Assistant [there]."  *See* Defs.' Local R. 56(a)1 Statement [doc. # 86-2] ¶ 49.

Plaintiffs claim that Building 6 was "a unit for especially hard to control children," and that Mr.

Cardillo "was not initially assigned" to Building 6 on his return, but only "after he began to

vigorously press the claims of Ms. Goodwine."  *See* Pls.' Local R. 56(a)2 Statement [doc. # 99-3]

¶ 49.  However, Plaintiffs do not state where Mr. Cardillo was "initially assigned."  In any case,

---

[3] Those grievances were all denied by DCF in March 2007.  Ms. Goodwine then took one of the grievances to the next level, the OLR, where it was denied in July 2007.

[4] The Affirmative Action Complaint alleged discrimination relating to race, color, sex, and age, as well as retaliation.  *See* Affirmative Action Compl., Ex. 12 to Mot. for Summary J. [doc. # 86-15] at 1. More specifically, the complaint alleged that Ms. Goodwine was "struck by a white male for no reason whatsoever," that her "white supervisors . . . took 3 days to report [the incident] to Human Resources," that those supervisors "at no time were . . . concerned about [her] safety," and that "[the] agency [had] made a mockery of the violence in the workplace standard."  *See id.* at 2.  On June 15, 2007, the Diversity Office wrote to Ms. Goodwine and advised her that it had not found reason to believe that discrimination had occurred.

on February 7, 2007, Mr. Cardillo, while working in Unit 6D within Building 6, responded to an emergency call from Unit 6C. In trying to break up a fight in Unit 6C, he sustained a head injury, which left him permanently disabled.

Ms. Goodwine and Mr. Cardillo filed their original Complaint [doc. # 1] on April 8, 2008. On September 16, 2008, Plaintiffs filed their first Amended Complaint [doc. # 35], and on October 28, 2008, Defendants filed a Motion to Dismiss [doc. # 39] the Amended Complaint in part. On December 10, 2008, the Court issued an Order [doc. # 44] directing the Plaintiffs to file a Second Amended Complaint that (1) removed Plaintiffs' § 1983 claim against DCF (Count Two) and intentional infliction of physical injury claim against DCF (Count Eight) and (2) labeled the existing Counts One and Five as against the individual Defendants in their individual capacities only. Plaintiffs' Second Amended Complaint [doc. # 47] – the operative complaint – was filed on December 14, 2008. On December 15, 2008, in light of the Second Amended Complaint, the Court denied Defendants' Motion to Dismiss [doc. # 39] as moot. *See* Order [doc. # 48]. On January 28, 2010, Plaintiff Joan Goodwine filed a Motion for Partial Summary Judgment [doc. # 63] as to Mr. Bendig only. In a Ruling and Order [doc. # 83] of June 1, 2010, the Court denied that motion. Defendants filed the pending Motion for Summary Judgment [doc. # 86] on June 30, 2010.

## II.

The standard of review this Court must apply when reviewing a motion for summary judgment pursuant to Rule 56 is a familiar one. Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[5] "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986), and the Court must resolve all ambiguities and draw all inferences in favor of the nonmoving party. *See Anderson*, 477 U.S. at 255; *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). If the moving party carries its burden, the party opposing summary judgment may not rely on mere allegations or denials, but rather must "cit[e] to particular parts of materials in the record" to demonstrate that a fact is genuinely disputed. Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to [demonstrate that a fact is genuinely disputed] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). In short, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."

---

[5] The wording and structure of Rule 56 of the *Federal Rules of Civil Procedure* changed as of December 1, 2010, but there was no change in the substantive standard for summary judgment.

*Anderson*, 477 U.S. at 249-50 (citations omitted).

### III.

The Court first addresses Ms. Goodwine's Title VII disparate treatment claim, Title VII hostile work environment claim, and § 1983 equal protection claim.

### A.

Title VII race- and sex-discrimination claims based on disparate treatment are governed by the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). A plaintiff may establish a *prima facie* case of discrimination by showing that: "1) she is a member of a protected class; 2) she was qualified for her position; 3) she suffered an adverse employment action; and 4) the action occurred under circumstances giving rise to an inference of discrimination." *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir. 1999). For the fourth element of the *prima facie* case, "[a] plaintiff relying on disparate treatment evidence must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself." *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003). Although the question of whether two individuals are similarly situated may present a factual issue for a jury, "a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met." *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 791 (2d Cir. 2007) (citation omitted).

Once the plaintiff makes out a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory rationale for the adverse action. *See Norville*, 196 F.3d at 95. "The burden is satisfied if the [defendant] articulates a 'clear and specific' reason which, if 'taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action.'" *Gladwin v. Pozzi*, No. 10-748-cv, 2010 WL 5141233, at *3 (2d Cir. Dec. 20,

2010) (quoting *Schnabel v. Abramson*, 232 F.3d 83, 88 (2d Cir. 2000)). If the defendant does so, "the burden shifts back to [the] plaintiff who must prove that a discriminatory reason was the actual reason for the employment action." *Id.* "Although intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.* (quoting *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000)).

In this case, there is no dispute that Ms. Goodwine is a member of a protected class and that she was qualified for her position. However, Defendants argue that Ms. Goodwine has not suffered any adverse employment action, and that none of the actions alleged by Ms. Goodwine occurred under circumstances giving rise to an inference of discrimination. On both points, the Court agrees with Defendants.

Employment actions that the Second Circuit has "deemed sufficiently disadvantageous to constitute an adverse employment action include a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to the particular situation." *Beyer v. County of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008) (citation, quotation marks, and alteration omitted). In some cases, "[a] denial of a transfer may also constitute an adverse employment action, but [the Second Circuit] require[s] a plaintiff to proffer objective indicia of material disadvantage." *Id.* In this case, Ms. Goodwine was not demoted, her job responsibilities were not changed, she was not denied a promotion, and she did not even request a transfer to an "objectively and materially better" position. *See id.* at 164.

The only "adverse employment action" alleged by Ms. Goodwine is DCF's decision to allow Mr. Bendig to return to work at the Cady School, rather than transferring him to another

school. *See* Mem. in Opp'n [doc. # 99-10] at 34. Specifically, Ms. Goodwine alleges that because Mr. Bendig was merely "giv[en] . . . a five day suspension and welcom[ed] back to work," she "had [a safe workplace] taken away from her," and "[s]he was also forced to work daily alongside the man who attacked her, and forced to wonder if he would do it again." *Id.* Ms. Goodwine acknowledges, though, that there were "no further incidents" between her and Mr. Bendig following Mr. Bendig's return to work in February 2007. Pls.' Local R. 56(a)(2) Statement [doc. # 99-3] ¶ 52. Indeed, at her deposition she testified that although Mr. Bendig did pass her in the hallway after he returned, he never again addressed her in any way that was inappropriate, and he never said or did anything that made her feel intimidated or threatened physically. *See* Goodwine Dep. at 200:8-21**.**

What bothered Ms. Goodwine was "just [Mr. Bendig's] presence being there." *Id.* at 200:21. Taken in the light most favorable to Ms. Goodwine, Ms. Goodwine's deposition testimony merely supports her claim that Mr. Bendig's return was subjectively bothersome to Ms. Goodwine. Because the decision to allow Mr. Bendig to continue working at the Cady School did not objectively and materially change the conditions of Ms. Goodwine's employment, it did not constitute an adverse employment action. *See, e.g.*, *Spina v. Our Lady of Mercy Med. Ctr.*, No. 97cv4661 (RCC), 2003 WL 22434243, at *4 (S.D.N.Y. Oct. 22, 2003) (finding that the defendant's refusal to transfer the plaintiff to another shift was not "a sufficiently adverse change, as the new position did not involve any significant improvement in the terms, privileges, or conditions of plaintiff's employment" and "[t]he only reason the plaintiff sought a transfer was to avoid working with [her alleged harasser]"), *aff'd* 120 F. App'x. 408 (2d Cir. 2005) (summary order); *O'Dell v. Trans World Entm't Corp.*, 153 F. Supp. 2d 378, 396 (S.D.N.Y. 2001) (finding that the defendant's failure to offer the plaintiff a new job not reporting to her alleged harasser

was not an adverse employment action), *aff'd* 40 F. App'x 628 (2d Cir. 2002) (summary order).

Moreover, even if the decision to allow Mr. Bendig to return to work at the school could be considered an adverse employment action – which it cannot – Ms. Goodwine cannot show that the decision occurred under circumstances giving rise to an inference of discrimination on the basis of race or sex. Ms. Goodwine's Title VII discrimination claim is based on her assertion that "[w]hite women have been treated differently [than her]." Mem. in Opp'n [doc. # 99-10] at 22. If a plaintiff wishes to "raise[] an inference of discrimination by showing that she was subjected to disparate treatment," she "must show she was 'similarly situated in all material respects' to the individuals with whom she seeks to compare herself." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000).

Often in Title VII discrimination cases based on allegations of disparate treatment, the plaintiff is the employee who was disciplined, and the basis of the plaintiff's complaint is a claim that "similarly situated employees who went undisciplined engaged in comparable conduct." *See id.* at 40. In those cases, courts must ask "(1) whether the plaintiff and those [she] maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness." *Id.*; *see also Carter v. New Venture Gear, Inc.*, 310 F. App'x 454, 457 (2d Cir. 2009) (summary order) ("A plaintiff alleging discrimination based on disparate disciplinary treatment . . . . must show that she engaged in an act of 'comparable seriousness,' but was punished more severely than similarly situated coworkers based on an application of disciplinary rules or a code of conduct."). To determine whether two acts by different employees were of comparable seriousness, courts examine not only the acts themselves but also "context and surrounding circumstances." *See Graham*, 230 F.3d at 40.

Ms. Goodwine does not claim that she was disciplined while other employees who engaged in the same conduct went undisciplined, but rather that her complaint regarding Mr. Bendig's misconduct was not treated with the same seriousness with which DCF treated complaints by white female employees. *See* Mem. in Opp'n [doc. # 99-10] at 22-23. Nonetheless, the Court believes that the factors the Second Circuit has identified as relevant to evaluating disparate treatment claims based on allegations that similar misconduct by other employees went unpunished can be adapted for the purpose of evaluating Ms. Goodwine's less conventional employment discrimination claim. In this case, the relevant questions are: (1) whether the cases Ms. Goodwine cites as comparators involved employees "subject to the same standards governing performance evaluation and discipline" as Mr. Bendig; and (2) whether the complainants in those cases "engaged in conduct" similar to Ms. Goodwine's, including, presumably, making complaints similar to Ms. Goodwine's original complaint against Mr. Bendig. *See Norville v. Staten Island University Hosp.*, 196 F.3d at 96.

In Ms. Goodwine's case, Mr. Bendig was a science teacher at the school where she was an Instructional Assistant, and Ms. Goodwine initially complained (1) that Mr. Bendig had hit her on the side of her forehead, (2) that as a result she had a headache, and (3) that shortly after Mr. Bendig hit her he said, "I'll kick your ass." Labor Relations Investigation Report of Jan. 9, 2007, Ex. 4 to Mot. for Summary Judgment [doc. # 86-7] at 2; Goodwine Aff. [doc. # 99-2] ¶ 10; Gavey Aff. [doc. # 86-30] ¶ 16. She also complained that Mr. Bendig had on several occasions called her "goodswine," and had previously commented "it looks like Rhea [Tompkins] kicked your ass" and that he "took a poll of staff and they say that Rhea could kick your ass." Labor Relations Investigation Report of Jan. 9, 2007, Ex. 4 to Mot. for Summary Judgment [doc. # 86-7] at 2; Goodwine Aff. [doc. # 99-2] ¶¶ 7, 10; Gavey Aff. [doc. # 86-30] ¶ 19. After Ms.

Goodwine made her complaint, Mr. Bendig was put on administrative leave, and then, following an investigation and *Loudermill* hearing, Mr. Bendig was suspended without pay for five days.

By contrast, according to Ms. Goodwine, "after Mr. Mattera harassed a white woman, [KM], at CJTS in 2002, he was removed from the school to the Central Office, and . . . after he harassed a white woman, [JS], at Central Office he was transferred back to CJTS."[6]  Mem. in Opp'n [doc. # 99-10] at 11.  Ms. Goodwine also claims that when "[PD], a white woman, complained she was afraid of [JM], a white male teacher," JM "was transferred . . . to another DCF facility."  *Id.* at 22.

The basis for Ms. Goodwine's statements regarding PD and JM is Ms. Goodwine's own general second-hand knowledge of that incident and the conclusory assertions of Mr. Cardillo, her co-Plaintiff, in his affidavit.  *See* Goodwine Dep. [doc. # 86-21] at 68:23-71:4; Cardillo Aff. [doc. # 99-1] ¶ 15.  In his affidavit, Mr. Cardillo merely states that "[PD], a white woman, complained that she was afraid of [JM], a white male teacher" and "[JM] was transferred from CJTS to another DCF facility."  Cardillo Aff. [doc. # 99-1] ¶ 15.  At her deposition, Ms. Goodwine stated several times that she was "not sure exactly what happened" to PD and that she did not "know all the details of that incident."  Goodwine Dep. [doc. # 86-21] at 68:25-69:2, 69:8-10, 69:18-22, 70:3-4, 71:2-4.  Beyond Ms. Goodwine's testimony at her deposition that she heard that "[a] complaint was made" having "to do with [PD] being harassed by [JM]" which led to JM being "no longer . . . there," the record contains no evidence of the particulars of the PD-JM incident.  *See id.* at 70:8-71:3.

Ms. Goodwine's claims regarding the results of harassment complaints against Mr. Mattera are based solely on the unsupported statements of Mr. Cardillo.  *See* Mem. in Opp'n

---

[6] The Court refers to the non-party alleged victims and harasser by their initials.

[doc. # 99-10] at 22-24.  In his affidavit, Mr. Cardillo does not detail the nature of Mr. Mattera's alleged harassment of KM or JS, and he does not explain the basis for his belief that the incidents involving those women were similar to the incident involving Ms. Goodwine and Mr. Bendig. *See* Cardillo Aff. [doc. # 99-1] ¶ 15.  Nor did Mr. Cardillo provide that information at his deposition.  *See* Cardillo Dep. [doc. # 102] at 161:5-166:16, 232:12-233:11, 253:1-7, 259:19-25.

The scant evidence in the record does not indicate that the incidents involving Mr. Mattera are appropriate comparators.  The "stipulated agreement" that followed KM's complaint was the result of a "negotiated settlement" – not, for example, a disciplinary decision following a *Loudermill* hearing.  *See* Mattera Dep. at 16:3-25; Cardillo Dep. [doc. # 102] at 162:2.  With regard to the incident involving JS, Mr. Mattera testified at his deposition that the complaint by JS was found to be unsubstantiated, that there was no *Loudermill* hearing in that case, and that "nothing became of the complaint except that [he] went back to [his] position."  *See* Mattera Dep. at 23:8-16.  In addition, while at the time Ms. Goodwine made her complaint, Mr. Bendig was a teacher at the Cady School, when KM complained about Mr. Mattera, Mr. Mattera was the principal of the school.  And when JS filed her complaint against Mr. Mattera, Mr. Mattera was working at DCF's Central Office as Principal of the "No Nexus" Unit.  *See* Mattera Aff. [doc. # 86-31] ¶ 6.  None of those facts suggest that the Goodwine-Bendig case is at all comparable to the cases involving Mr. Mattera.  *See, e.g.*, *Larson v. Portage Twp. Sch. Corp.*, 293 F. App'x 415, 419-20 (7th Cir. 2008) (summary order) (noting that the plaintiff "offered [virtually] no evidence . . . that teachers at [the school] [were] subject to the same standards as the principal" and concluding that the plaintiff teacher "was in no way similarly situated" to the principal).  The record contains no further information about KM's and JS's complaints or about the PD-JM incident.

Contrary to Plaintiffs' suggestion, *see* Mem. in Opp'n [doc. # 99-10] at 34, it is not Defendants' burden to distinguish Mr. Mattera's and JM's cases from Mr. Bendig's. *See Graham*, 230 F.3d at 41-42. Rather, it is Ms. Goodwine's burden to show that she was similarly situated to PD, KM, and JS. *See, e.g.*, *Norville*, 196 F.3d at 96 ("Because [the plaintiff] produced insufficient evidence . . . to show that the [employer] treated similarly situated employees more favorably, she failed to establish a prima facie case of race discrimination."). Ms. Goodwine cannot satisfy that burden with mere "conclusory statements" or "allegations unsupported by admissible evidence." *Shumway v. United Parcel Service, Inc.*, 118 F.3d 60, 65 (2d Cir. 1997).

The Court notes that Ms. Goodwine had more than ample opportunity to pursue discovery to support her assertion that similarly situated white employees were treated better than her, but she did not do so. Plaintiffs did not subpoena DCF disciplinary records or take the depositions of any of the Human Resources personnel involved in Ms. Goodwine's case, PD's case, or the cases of the two women allegedly harassed by Mr. Mattera. The Court must evaluate Ms. Goodwine's Title VII discrimination claim on the record before it. Within that record, there is no evidence from which a reasonable jury could conclude that Ms. Goodwine's race (or sex for that matter) motivated DCF's decision to allow Mr. Bendig to continue to work at the Cady School and CJTS.

Ms. Goodwine has offered no evidence showing that she was similarly situated to PD, KM, or JS – she has not provided specific evidence regarding the alleged actions of the three other women's alleged harassers, the circumstances in which the women made their complaints and DCF evaluated those complaints, or the process by which the alleged harassers were disciplined. *See Norville*, 196 F.3d at 96 (holding that the plaintiff had not shown that her employer treated her less favorably than similarly situated white nurses after she became

disabled because "[t]he . . . record contain[ed] no evidence regarding the specific degree to which either of [the other] nurses was disabled, the type of work they did prior to becoming disabled, or the ways in which they were limited in performing their jobs").

Furthermore, although Ms. Goodwine's Complaint alleges that DCF discriminated against her on the basis of both her race and sex in violation of Title VII, Ms. Goodwine has presented no evidence at all that DCF treated Ms. Goodwine differently from other employees on the basis of her sex. Indeed, at the evidentiary hearing, Plaintiffs' counsel allowed that race discrimination was the main crux of Ms. Goodwine's two discrimination claims.[7] Because Ms. Goodwine has not presented evidence from which a reasonable jury could conclude that she was treated differently from similarly situated white employees or similarly situated male employees, she cannot prevail on her Title VII discrimination claim.

Finally, even if Ms. Goodwine could meet her *prima facie* burden – which she cannot – her Title VII discrimination claim would fail because Defendants have provided a lawful explanation for their decision not to transfer Mr. Bendig: "Human Resources personnel . . . consulted a DCF database of employee misconduct and determined that a similar allegation of unauthorized touching of a co-worker had resulted in a one-day suspension." Mem. in Supp. [doc. # 86-1] at 12. DCF's explanation is supported by the affidavit of Ms. Perez, who affirmed that she recalled an incident with facts similar to those Ms. Goodwine alleged in her initial complaint and, after checking DCF records, proposed a punishment modeled on the disciplinary action taken in that earlier case. *See* Perez Aff. [doc. # 86-27] ¶ 9.

---

[7] It bears mentioning that none of the grievances Ms. Goodwine filed in late January 2007 alleged race or sex discrimination, and even Ms. Goodwine's Affirmative Action Complaint of February 16, 2007 included no specific allegation that she was treated differently from similarly situated white employees or male employees.

In response to Defendants' stated reason for suspending Mr. Bendig, Ms. Goodwine simply cites Mr. Cardillo's affirmations that "[i]n his experience as a Union Steward and Union Vice President, violence of one employee against another is cause for termination," that "[h]e was involved as Union Steward and Union Vice President in cases where employees of DCF were fired for implying that force would be used," and that "[i]mproper touching of the opposite sex is cause for involuntary transfer." *See* Mem. in Opp'n [doc. # 99-10] at 24; Cardillo Aff. [doc. # 99-1] ¶ 15. Even if the Court credited Mr. Cardillo's conclusory assertions – and the Court does not do so – they do not controvert Ms. Perez's testimony regarding the process she followed to determine the appropriate discipline for Mr. Bendig. Because Ms. Goodwine has provided no evidence from which a reasonable jury could conclude that Defendants' lawful explanation for their decision is mere pretext, Ms. Goodwine's Title VII discrimination claim does not survive summary judgment.

**B.**

To prevail on a Title VII hostile work environment claim, a plaintiff must show "conduct (1) that is 'objectively' severe or pervasive – that is, [conduct that] creates an environment that a reasonable person would find hostile or abusive [the 'objective' requirement], (2) that the plaintiff 'subjectively perceive[s] as hostile or abusive' [the 'subjective' requirement], and (3) that creates such an environment because of plaintiff's sex (or other characteristic protected by Title VII) [the 'prohibited causal factor' requirement]." *Gregory v. Daly*, 243 F.3d 687, 691-92 (2d Cir. 2001) (citations omitted). The Second Circuit has instructed district courts as follows:

> The matter of whether the conduct alleged was so "severe or pervasive" as to create "an objectively hostile or abusive work environment," is to be decided based on the totality of the circumstances, in light of such factors as the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it

unreasonably interferes with an employee's work performance."

*Patterson v. County of Oneida*, 375 F.3d 206, 227 (2d Cir. 2004) (quoting *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21 (1993)).   A plaintiff can establish a hostile work environment claim by showing "either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000) (citation and quotation marks omitted).   "When a co-employee . . . is alleged to have engaged in harassing activity, the employer will generally not be liable unless the employer either provided no reasonable avenue for complaint or knew of the harassment and did nothing about it." *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 766 (2d Cir. 1998) (citation and quotation marks omitted).

Insofar as Mr. Bendig's conduct toward Ms. Goodwine may have risen to the level of harassment actionable under the "hostile work environment" provision of Title VII, that conduct cannot form the basis for Ms. Goodwine's Title VII hostile work environment claim because: (1) Mr. Bendig was merely a co-employee of Ms. Goodwine's; (2) Ms. Goodwine had a reasonable avenue for complaint, which she exercised; and (3) her employer, DCF, took action to remedy the situation as soon as it became aware of the alleged harassment.  *See Quinn*, 159 F.3d at 766. There is no evidence that DCF was aware of or should have been aware of the allegedly harassing behavior by Mr. Bendig before Ms. Goodwine's report on December 26.   Moreover, there was a complaint procedure in place – which Ms. Goodwine utilized – and her employer took prompt action.   Indeed, Ms. Goodwine herself states that she is *not* imputing the actions of Mr. Bendig to DCF.  *See* Mem. in Opp'n [doc. # 99-10] at 31.

Ms. Goodwine's hostile work environment claim apparently is based solely on events that

transpired after Mr. Bendig was disciplined in January 2007. Contrary to Ms. Goodwine's unsupported allegations, there is no evidence that she was harassed in violation of Title VII's hostile work environment provision following Mr. Bendig's return to work in February 2007.

First, Ms. Goodwine has not shown that she was subject to harassment that was "objectively severe or pervasive." *See Patterson*, 375 F.3d at 227. The Second Circuit has emphasized that "the fact that the law requires harassment to be severe or pervasive before it can be actionable does not mean that employers are free from liability in all but the most egregious of cases." *Dawson v. County of Westchester*, 373 F.3d 265, 273 (2d Cir. 2004) (citation omitted). However, "bare declarations of being 'treated poorly on the job and harassed' . . . cannot support a hostile work environment claim." *Gregory*, 243 F.3d at 692 (citation omitted). In this case, Ms. Goodwine has affirmed that she told Ms. Gavey that she was "uncomfortable and fearful about Mr. Bendig returning to work with [her]," Goodwine Aff. [doc. # 99-2] ¶ 16; that she made complaints to Mr. Mattera about "having to see and pass Mr. Bendig on a daily basis" but that Mr. Mattera "never did anything about it," *id.* ¶ 25; that "[c]ommunication with [her] dropped dramatically" and her "emails were not given responses," *id.* ¶ 29; and that she was "treated as a troublemaker." *Id.* Ms. Goodwine also argues that Ms. Gavey's role as the hearing officer who reviewed the grievances Ms. Goodwine filed with Mr. Cardillo's assistance was a "gross violation of due process" and contributed to a hostile work environment because Ms. Gavey herself was involved in the processes that were the subject of the grievances. *See* Mem. in Opp'n [doc. # 99-10] at 30-31.

The core of Ms. Goodwine's hostile work environment claim is that DCF inadequately responded to Ms. Goodwine's initial complaint about Mr. Bendig's alleged assault and verbal threats. *See* Mem. in Opp'n [doc. # 99-10] at 31-32. But DCF's response could not itself have

created a hostile work environment because it did not objectively alter the conditions under which Ms. Goodwine worked. *See Alfano*, 294 F.3d at 373-74. Indeed, the Second Circuit recently held that an employer's failure to investigate an employee's complaint of discrimination did not by itself "alter the terms and conditions of [her] employment," and therefore "could not itself have contributed to or constituted a hostile work environment." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 724 (2d Cir. 2010). As the court explained, the employer's failure to investigate the employee's complaint merely "preserved the very circumstances that were the subject of the complaint." *Id.* In support of its holding, the court noted that "in the analogous context of hostile work environment claims based on allegations of sexual harassment, federal courts . . . appear to have uniformly rejected the notion that a failure adequately to remediate sexual harassment itself constitutes an act that may contribute to a hostile work environment claim." *Id.* (citation, quotation marks, and alteration omitted).

In Ms. Goodwine's case, DCF did investigate Ms. Goodwine's complaint, DCF put Mr. Bendig on administrative leave once it learned of the incident, and DCF disciplined Mr. Bendig. Moreover, as Ms. Goodwine herself admits, following his suspension, Mr. Bendig never again touched her or made an offensive comment toward her. If anything, DCF's response to Ms. Goodwine's complaint improved "the . . . circumstances that were the subject the complaint." *See id.* Therefore, DCF's decision to suspend rather than transfer Mr. Bendig did not create "an objectively hostile or abusive work environment." *See Patterson*, 375 F.3d at 227.

Ms. Goodwine's argument that Ms. Gavey's role as the hearing officer who reviewed her workplace violence grievances contributed to a hostile work environment is also without merit. Indeed, Ms. Goodwine cites no evidence in support of her claim that "Ms. Gavey undertook [that role] to ensure that the decision that she, Mr. Mattera and Dr. Sullivan reached and approved,

was not overturned." *See* Mem. in Opp'n [doc. # 33-38] at 33. Nor does she cite any case law in support of her claim that Ms. Gavey's actions constituted a "gross violation of due process." *See id.* In any case, as noted already, the one grievance that Ms. Goodwine took to the next level of review was denied by the Office of Labor Relations in July 2007. There is no evidence that Ms. Goodwine was in any way prejudiced by Ms. Gavey's review of her grievances, let alone that Ms. Gavey's involvement in the grievance review contributed to a "workplace . . . permeated with discriminatory intimidation, ridicule, and insult . . . sufficiently severe or pervasive to alter the conditions of [Ms. Goodwine's] employment and create an abusive working environment." *Harris*, 510 U.S. at 21.

The other experiences that Ms. Goodwine complains of – not receiving responses to emails and having to share the hallways with an unsavory colleague – are the sort of "ordinary tribulations of the workplace" that the Title VII hostile work environment standards are meant to "filter out." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citation omitted) (noting that those "standards . . . . are sufficiently demanding to ensure that Title VII does not become a 'general civility code'" (citation omitted)). Ms. Goodwine has not alleged that she was subjected to "offensive utterance[s]" after Mr. Bendig returned in February 2007, let alone any "physically threatening or humiliating" actions. *See Harris*, 510 U.S. at 23. Finally, Ms. Goodwine's assertion that she was "treated as a troublemaker," Goodwine Aff. [doc. # 99-2] ¶ 29, is at best a "bare declaration[] of being treated poorly on the job," *Gregory*, 243 F.3d at 692 (citation and quotation marks omitted), and, as such, insufficient to support her hostile work environment claim. *See id.* Whether or not Ms. Goodwine subjectively perceived her environment to be "abusive" or "hostile" beginning in January or early February 2007, she has not proffered any evidence that she was the victim of either "a single incident [that] was extraordinarily severe," or

"a series of incidents [that] were 'sufficiently continuous and concerted' to have altered the conditions of her working environment" during that time period. *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (citation omitted). Therefore, Ms. Goodwine has produced no evidence of any post-December 2006 events that would satisfy the "objective" requirement of the Title VII hostile work environment standard. *Id.*; *see Gregory*, 243 F.3d at 691.

Second, as discussed already, there is no evidence that Ms. Goodwine's race or sex was a factor in DCF's decision to allow Mr. Bendig to return to work. There is also no evidence that any of the alleged actions by DCF personnel following Mr. Bendig's return were motivated by Ms. Goodwine's race or sex. Indeed, in her brief in opposition to the Motion for Summary Judgment, Ms. Goodwine cites Mr. Cardillo's affidavit for the proposition that "[w]hite women have been protected from their attackers" in a way that Ms. Goodwine was not, Mem. in Opp'n [doc. # 99-10] at 30, but she offers no further support for her claim that DCF's actions were racially and sexually motivated. Ms. Goodwine does suggest that "[Mr.] Bendig's repeated use of the word 'goodswine' [before January 2007] . . . is enough to show that he – for his part – had racial animus." *Id.* at 26. However, as already noted – and as Ms. Goodwine does not dispute – Mr. Bendig's actions cannot be imputed to DCF because they occurred well before she made her complaint against Mr. Bendig on December 26, 2006. *See id.* at 31. According to Ms. Goodwine, prior to December 26, 2006, she never reported any of Mr. Bendig's inappropriate remarks to her supervisors. *See* Pls.' Local R. 56(a)(2) Statement [doc. # 99-3] ¶¶ 14, 15; Goodwine Dep. at 80:14-21, 100:2-22. Ms. Goodwine therefore fails to establish the prohibited causal factor requirement of her hostile work environment claim. *See Vito v. Bausch & Lomb, Inc.*, No. 10-756-cv, 2010 WL 5129223, at *1 (2d Cir. Dec. 17, 2010) (summary order) ("[I]t is axiomatic that in order to establish a . . . hostile work environment . . . a plaintiff must

demonstrate that the conduct occurred because of her [membership in a protected class]." (citation omitted; alterations in original)).

Because no reasonable jury could find on the basis of the evidence presented that Ms. Goodwine was subjected to a hostile work environment, her Title VII hostile work environment claim does not survive summary judgment.[8]

## C.

In addition to the Title VII disparate treatment and hostile work environment claims, the Complaint includes a claim under 42 U.S.C. § 1983 that charges the individual Defendants with "discriminat[ing] against [Ms.] Goodwine, with intent, and out of racial and gender animosity" while "act[ing] under the color of law." Second Amended Compl. [doc. # 47] at 12, ¶¶ 48, 47.[9] At the hearing on Defendants' summary judgment motion, Ms. Goodwine's counsel informed the Court that this count is an equal protection claim.

---

[8] In the last paragraph of the "Facts" section of their Complaint, Plaintiffs state that "[s]ince the start of 2007. . . both Plaintiffs have been subjected to a hostile work environment, based on race and gender." Second Amended Compl. [doc. # 47] at 11, ¶ 43. However, the Third Count of the Complaint – the count that asserts a Title VII hostile work environment claim – alleges only that Defendants subjected Ms. Goodwine to a hostile work environment; there is no mention of Mr. Cardillo. *See id.* ¶¶ 56-59. Furthermore, Plaintiffs' Memorandum in Opposition [doc. # 99-10] does not argue that Mr. Cardillo was subjected to a hostile work environment. Therefore, the Court does not construe the hostile work environment claim as having been asserted on behalf of Mr. Cardillo.

[9] Ms. Goodwine states that her § 1983 discrimination claim – the First Count of the Complaint – applies to "ALL INDIVIDUAL DEFENDANTS," and that "Defendant Mattera was the supervisor of both Plaintiffs; Defendant Gavey was in charge of personnel matters for CJTS; and Defendant Sullivan was the Superintendent of the school district and Chief Enforcement Officer for Sexual Harassment." Second Amended Compl. [doc. # 47] at 11. The First Count also alleges that "Defendants Mattera, Gavey, Perez, and Sullivan were charged with duties to protect persons in the position of Plaintiff Goodwine from sexual harassment and from continuing post-harassment encounters with the sexual harasser and to protect persons in the position of Plaintiff Cardillo from retaliation." *Id.* at 11-12. Although Mr. Bendig is one of the "individual defendants" in this action, Mr. Bendig is not mentioned anywhere within the body of the First Count. As a consequence, the Court construes that claim not to be brought against Mr. Bendig.

The Second Circuit has held that "[a] Title VII plaintiff is not precluded from bringing a concurrent § 1983 cause of action, such as a claim for denial of equal protection, so long as the § 1983 claim is based on a distinct violation of a constitutional right." *Patterson*, 375 F.3d at 225 (citation and quotation marks omitted). "A § 1983 claim has two essential elements: (1) the defendant acted under color of state law; and (2) as a result of the defendant's actions, the plaintiff suffered a denial of her federal statutory rights, or her constitutional rights or privileges." *Annis v. County of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998).

Race-based or gender-based employment discrimination, whether it takes the form of disparate treatment or a hostile work environment, can form the basis of a § 1983 equal protection claim. *See Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006). "Once action under color of state law is established, the analysis for such claims is similar to that used for employment discrimination claims brought under Title VII, the difference being that a § 1983 claim . . . can be brought against individuals." *Id.* Thus, to the extent Ms. Goodwine's § 1983 equal protection claim is based on allegations of disparate treatment, Ms. Goodwine has the burden of establishing that the action occurred under circumstances giving rise to an inference of unlawful discrimination. *See Das v. Consol. Sch. Dist. of New Britain*, 369 F. App'x 186, 188 (2d Cir. 2010) (summary order). To the extent that Ms. Goodwine's § 1983 equal protection claim is based on allegations of a hostile work environment, she must produce evidence of a "workplace . . . permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment" – just as she must for her Title VII hostile work environment claim. *Demoret*, 451 F.3d at 149 (quoting *Harris*, 510 U.S. at 21). As in a Title VII hostile work environment claim, she also must demonstrate both "that she subjectively perceived the

environment to be abusive" and "that the environment was objectively hostile and abusive." *Id.*

As explained already, Ms. Goodwine has not produced evidence from which a reasonable jury could conclude either that she was the victim of an adverse employment action under Title VII's disparate treatment provision, or that she was subject to workplace abuses severe or pervasive enough to constitute a hostile work environment under Title VII's hostile work environment provision. She also has not produced evidence from which a reasonable jury could conclude that any individual Defendant, acting under color of state law, discriminated against her on the basis of her race or sex. Therefore, no reasonable jury could find for Ms. Goodwine on her § 1983 equal protection claim on the basis of the evidence Ms. Goodwine has presented, and that claim does not survive summary judgment.[10]

## IV.

The Court next turns to Mr. Cardillo's claims – brought pursuant to Title VII and

[10] Ms. Goodwine suggests several times in her brief in opposition to summary judgment that DCF violated Ms. Goodwine's federal rights because it did not follow its own rules and procedures in its response to Ms. Goodwine's complaint against Mr. Bendig. *See* Mem. in Opp'n [doc. # 99-10] at 5, 24, 27, 31-33. However, the question of whether DCF followed its own policies and "the Governor's Violence in the Workplace Policy," *see id.* at 31, is a matter of state law – it is only relevant to Ms. Goodwine's Title VII and equal protection claims insofar as DCF's alleged failure to follow the state regulations constituted an adverse employment action or created a hostile work environment. As discussed already, none of the alleged deficiencies in DCF's response to Ms. Goodwine's complaint rose to those levels. Ms. Goodwine has presented no evidence that she was prejudiced by DCF's alleged reporting failures. Indeed, although Ms. Goodwine argues that DCF violated state policies by not reporting the Goodwine-Bendig incident to the state police immediately, DCF did notify the state police of the incident shortly after Ms. Goodwine made her complaint. *See* Pls.' Local R. 56(a)(2) Statement [doc. # 99-3] ¶ 35; Goodwine Aff. [doc. # 99-2] ¶¶ 10-11. It was Ms. Goodwine who remained uncertain for several weeks whether she wanted to pursue a complaint with the state police. Moreover, according to Ms. Goodwine, after Ms. Goodwine eventually made a statement to the police, the police sought a warrant for Mr. Bendig's arrest, but a judge denied that request. *See* Goodwine Aff. [doc. # 99-2] ¶ 27. Finally, whether or not DCF's alleged failure to follow its own rules and procedures constituted an adverse employment action, that alleged failure would not violate Ms. Goodwine's federal rights under Title VII and the Equal Protection Clause unless it entailed discrimination on the basis of Ms. Goodwine's race or sex. There is no evidence that it did.

42 U.S.C. § 1983 – that the Defendants retaliated against him because of his efforts "to protect the rights" of Ms. Goodwine.  Second Amended Compl. [doc. # 47] at 15.

## A.

The standard for proving a claim of retaliation under Title VII, 42 U.S.C. § 2000e-3, is similar to the standard for proving a claim of discrimination under Title VII.  In order to establish a *prima facie* case of retaliation, a plaintiff must show: "(1) that [he] participated in an activity protected by Title VII, (2) that [his] participation was known to [his] employer, (3) that [his] employer thereafter subjected [him] to a materially adverse employment action, and (4) that there was a causal connection between the protected activity and the adverse employment action." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010).  If the plaintiff carries his *prima facie* burden, "the burden of production shifts to the defendant to proffer a legitimate non-retaliatory reason for the adverse employment action."  *Id.* at 552-53.  Once the defendant does so, the burden shifts back to the plaintiff to offer evidence "sufficient to permit an inference that the employer's proffered non-retaliatory reason is pretextual and that retaliation was a substantial reason for the adverse employment action." *Id.* at 553 (quotation marks and citation omitted).

Mr. Cardillo alleges that Defendants retaliated against him when they assigned him to serve as an Instructional Assistant in Building 6 at the school, following his return from a worker's compensation leave.  *See* Second Amended Compl. [doc. # 47] at 7, 14.  Although Mr. Cardillo does not explain why his assignment to Building 6 constituted an adverse employment action, he does contend that it was an "assignment to the housing unit whose inmates who were too uncontrolled to attend regular classes with the others."  Mem. in Opp'n [doc. # 99-10] at 36.

The Court first considers whether Mr. Cardillo engaged in any activity that was protected under 42 U.S.C. § 2000e-3 before he was assigned to Building 6.  Two different categories of

activity are protected under § 2000e-3(a): "oppos[ing] any practice made an unlawful employment practice by" Title VII and "ma[king] a charge, testify[ing], assist[ing], or participat[ing] in any manner in an investigation, proceeding, or hearing under" Title VII. 42 U.S.C. § 2000e-3(a). Although Mr. Cardillo and DCF disagree about the date of Mr. Cardillo's assignment to Building 6, Mr. Cardillo acknowledges that he was assigned to that unit no later than the first week in February 2007. *See* Cardillo Aff. [doc. # 99-1] ¶ 18. As Mr. Cardillo notes, in late January 2007, Mr. Cardillo filed several grievances on behalf of Ms. Goodwine. But those grievances, like Ms. Goodwine's initial complaints to Human Resources, asserted only workplace violence complaints – they made no mention of *sex-based* or *race-based* disparate treatment or harassment. *See* Ex. 10 to Mot. for Summary Judgment [doc. # 86-13]. There is no evidence that Mr. Cardillo made any complaints pursuant to Title VII or opposed any practice made unlawful by Title VII in the month before he was assigned to Building 6. To the extent that Mr. Cardillo may have engaged in activity protected by Title VII *later* in February 2007, those efforts cannot have caused his assignment to Building 6 several weeks earlier. Because Mr. Cardillo did not engage in activity protected by Title VII prior to the alleged adverse employment action, he fails to satisfy the *prima facie* burden for his Title VII retaliation claim.

Moreover, DCF has proffered a lawful explanation for the decision to assign Mr. Cardillo to Building 6: "he was assigned to a position in Unit 6D because there was a need for an instructional assistant there." Defs.' Local R. 52(a)(1) Statement [doc. # 86-2] ¶ 49. That explanation is supported by the affidavit of Ms. Mule, who has affirmed that she was responsible for assigning Mr. Cardillo and other Instructional Assistants to their respective students and classrooms, *see* Mule Aff. [doc. # 86-28] ¶¶ 4, 30, and that Mr. Cardillo "was assigned to

27

Building 6 . . . . because there was [a] gap in coverage for a student and [they] needed coverage by an Instructional Assistant." *Id.* ¶ 30. Mr. Cardillo has offered no evidence that DCF's proffered explanation for his assignment is mere pretext; nor did he ever take Ms. Mule's deposition.

Because Mr. Cardillo has not even established a *prima facie* case of retaliation in violation of Title VII, because DCF has offered a lawful explanation for its decision to assign Mr. Cardillo to Building 6, and because Mr. Cardillo has not shown any evidence of pretext, the Court need not reach the question of whether Mr. Cardillo's assignment constituted an adverse employment action and whether "[a]s a direct and proximate result of [his assignment], [Mr. Cardillo] suffered and continues to suffer damages." Second Amended Compl. [doc. # 47] at 15, ¶ 68. However, although the Court does not reach the issue of whether Mr. Cardillo suffered an adverse employment action, it should be noted that Mr. Cardillo's representation of facts relevant to that element of his Title VII retaliation claim has been inconsistent. *See* Cardillo Dep. [doc. # 102] at 266:2-3, 266:10-21; Cardillo Aff. [doc. # 99-1] ¶¶ 18-19; Pls.' Local R. 52(a)(2) Statement [doc. # 99-3] ¶¶ 69-70; Mem. in Opp'n [doc. # 99-10] at 13.

Regardless of whether Mr. Cardillo's assignment to a unit in Building 6 constituted an adverse employment action, for the reasons previously noted, no reasonable jury could find for Mr. Cardillo on his Title VII retaliation claim on the basis of the evidence presented. Therefore, that claim does not survive summary judgment.

**B.**

The Fourth Count of the Second Amended Complaint asserts a claim of "42 USC § 1983 Retaliation" against Mr. Mattera, Ms. Gavey, Ms. Perez, and Mr. Sullivan. Second Amended Compl. [doc. # 47] at 14. A claim brought pursuant to 42 U.S.C. § 1983 must charge that the

defendant, acting under color of state law, deprived the plaintiff of a federally protected right, such as a constitutional right. *See Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982). However, "a § 1983 action may not . . . be brought to vindicate rights conferred only [by] a statute that contains its own structure for private enforcement, such as Title VII." *Patterson*, 375 F.3d at 225. Thus, Mr. Cardillo's right under Title VII not to be retaliated against for engaging in activity protected by Title VII cannot be the basis for his § 1983 retaliation claim. It is not clear from the operative complaint which federal statutory or constitutional right or privilege provides the ground for Mr. Cardillo's § 1983 retaliation claim. When pressed at oral argument, Plaintiffs' counsel did not state which federal provision formed the basis for the § 1983 retaliation claim asserted in the Fourth Count of the Complaint – he only mentioned that the Equal Protection Clause formed the basis for the § 1983 claim asserted in the First Count, which the Court has already addressed.

Even assuming for the sake of argument that Mr. Cardillo's efforts on behalf of Ms. Goodwine in late January 2007 were protected activity under some federal statute or constitutional provision, Mr. Cardillo's § 1983 retaliation claim still would fail. A § 1983 plaintiff must show that the individually named defendants were personally involved in the alleged violation of his rights. *See Farid v. Ellen*, 593 F.3d 233, 249 (2d Cir. 2010). The Second Amended Complaint alleges that four individual Defendants retaliated against Mr. Cardillo: Mr. Mattera, Ms. Gavey, Ms. Perez, and Mr. Sullivan. However, there is no evidence beyond Mr. Cardillo's unsupported suppositions that any of those Defendants were involved in the decision to assign Mr. Cardillo to Unit 6. Indeed, all of the evidence is to the contrary.

First, Ms. Gavey has affirmed that she "had no involvement in Mr. Cardillo's assignments at CJTS" and "did not oversee or make determinations on staff assignments of CJTS employees."

Gavey Aff. [doc. # 86-30] ¶ 41.  Second, Ms. Perez has stated that "[a]s the Assistant Human Resources Administrator 3," she "supervise[d] [Ms.] Gavey and other Principal Human Resources Specialists."  Perez Aff. [doc. # 86-27] ¶ 7.  Ms. Perez also affirmed that she "has spoken with [Mr.] Cardillo in passing while he has worked at Central Office during his periods of light duty status while injured."  *Id.* ¶ 6.  Third, Mr. Sullivan has stated that he "played no role in [Mr.] Cardillo's assignments within the Cady School."  Sullivan Aff. [doc. # 25] ¶ 25.  Fourth, Mr. Mattera has affirmed that he "do[es] not assign Instructional Assistants to their respective assignments [though] all changes in work hours did have to be approved by [him]" at the time Mr. Cardillo began work in Building 6.  Mattera Aff. [doc. # 86-31] ¶ 39.  Although Mr. Cardillo claims that an email from Mr. Mattera proves that Mr. Mattera was responsible for assigning Mr. Cardillo to Building 6, in fact, that email is consistent with Mr. Mattera's Affidavit.  *See* Email of Jan. 26, 2007 from John Mattera to Joseph Cardillo Re: "Assignment Hours," Ex. 8 to Mot. for Summary J. [doc. # 86-11] at 1 (stating that Mr. Cardillo "need[s] to know that all decisions regarding planning, scheduling or ANY programmatic issues or changes go through the principal [Mr. Mattera]," but making no mention of Mr. Cardillo's unit assignment in Building 6).[11]

---

[11] In his brief in opposition to summary judgment, Mr. Cardillo argues briefly that a letter "threatening legal action" sent to Mr. Cardillo by Mr. Mattera's attorney on May 1, 2007 was "itself retaliation and evidence that the earlier [assignment to Building 6] was also retaliatory in nature."  Mem. in Opp'n [doc. # 99-10] at 36.  The letter that Mr. Cardillo refers to demanded a retraction by Mr. Cardillo of statements by which Mr. Cardillo "attempted to impugn Mr. Mattera's personal and professional reputation and . . . sexual chastity," including some statements made in "writings" filed with DCF between January and May 2007.  Letter of May 1, 2007 from Attorney Arthur D. Machado to Joseph Cardillo, Ex. D to Obj. to Mot. for Summary J. [doc. # 99-8] at 1.  The letter was sent in accordance with Connecticut General Statutes § 52-237, which prevents a plaintiff from recovering general damages in a libel action "unless the plaintiff proves either malice in fact or that the defendant, after having been requested by the plaintiff in writing to retract the libelous charge . . . failed to do so."  *Id.*  To the extent that Mr. Cardillo suggests that Mr. Mattera sent him the letter in retaliation for activities Mr. Cardillo engaged in that were protected by Title VII, there is no indication that DCF – the only Defendant

At his deposition, Mr. Cardillo could identify no specific basis for his belief that the other three named Defendants were involved in his assignment to Building 6. *See* Cardillo Dep. [doc. # 102] at 264:17. Although Mr. Cardillo asserted that the Mr. Mattera, Mr. Sullivan, Ms. Gavey, and Ms. Perez "had to have" "consulted each other" about sending him to Building 6, *id.* at 264:19-20, he also admitted, "I can't prove it." *Id.* at 260:9-11.

Indeed, as noted already, Barbara Mule has stated that *she* was responsible for assigning Mr. Cardillo and other Instructional Assistants to their respective students and classrooms. *See* Mule Aff. [doc. # 86-28] ¶¶ 4, 30. Mr. Cardillo has presented no evidence contradicting Ms. Mule's affidavit, even though his counsel could have taken Ms. Mule's deposition during discovery. Thus, whatever its constitutional or statutory basis, Mr. Cardillo's § 1983 retaliation claim does not survive summary judgment.

## C.

The two retaliation counts in the Complaint allege only that Defendants retaliated against Mr. Cardillo. But in their briefs on summary judgment, both Plaintiffs and Defendants seem to presume that the Complaint alleges that Ms. Goodwine, too, was subject to retaliation. Assuming such a claim of retaliation against Ms. Goodwine were cognizable by the agreement of the parties – despite Ms. Goodwine's failure to plead it in the Complaint – that claim fails as well.

First, under the standard applicable to Title VII retaliation claims, Ms. Goodwine suffered no adverse employment action. Although Title VII's anti-retaliation provision prohibits

---

named in Mr. Cardillo's Title VII retaliation claim – had any involvement with the letter. Since there is no evidence beyond Mr. Cardillo's unsupported suppositions that Mr. Mattera was the person to assign Mr. Cardillo to Building 6 in late January or early February 2007, Mr. Mattera's personal demand for a retraction in May 2007 has no bearing on the reason for Mr. Cardillo's Building 6 assignment. *See* Mem. in Opp'n [doc. # 99-10] at 36.

a broader range of acts than Title VII's anti-discrimination provision, *see Burlington Northern & Santa Fe Rwy. Co. v. White*, 548 U.S. 53, 67 (2006), the anti-retaliation provision nonetheless protects employees only from retaliation that results in "injury or harm" – specifically, from "materially adverse" acts "that . . . well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 67-68. According to Ms. Goodwine, "[t]he events [that she cites as] constituting hostile work environment . . . are also [] events constituting retaliation." Mem. in Opp'n [doc. # 99-10] at 35. Those events include DCF's failure to "remove[]" Mr. Bendig from the Cady School and CJTS, *id.* at 30; "allowing Ms. Gavey to rule on complaints made against herself," *id.* at 30-31; and the alleged failure of some administrators to answer "normal communications" from Ms. Goodwine "[s]ince the start of 2007." *Id.* at 30; Goodwine Aff. [doc. # 99-2] ¶ 29.

As discussed already, DCF's decision to suspend rather than transfer Mr. Bendig did not objectively injure or harm Ms. Goodwine. If anything, the disciplinary action taken against Mr. Bendig benefited Ms. Goodwine, since following his suspension, Mr. Bendig never again did or said anything inappropriate to Ms. Goodwine. Moreover, even if there were objective grounds for Ms. Goodwine's dissatisfaction with DCF's decision not to transfer Mr. Bendig, the inadequacy of DCF's response would not transform that response into a retaliatory adverse employment action. As another district court in this Circuit has noted, "[a]ffirmative efforts to punish a complaining employee are at the heart of any retaliation claim." *Tomlinson v. Sharp Electronics Corp.*, No. 99cv9539 (CM), 2000 WL 1909774, at * 4 (S.D.N.Y. Dec. 18, 2000). Thus, a plaintiff claiming that she suffered a retaliatory adverse employment action after she complained of sex- or race-discrimination cannot simply allege that her employer's response to her complaint was deficient. *See, e.g.*, *O'Dell*, 153 F. Supp. 2d at 396 (noting that "an alleged

deficiency in an employer's internal complaint procedure or internal investigation of a sexual harassment complaint – even if the deficiency is little more than an attempt to strengthen an employer's defense – is not a retaliatory adverse employment action" (citing *United States v. New York City Transit Auth.*, 97 F.3d 672, 677 (2d Cir. 1996))). Therefore, DCF's failure to remove Mr. Bendig from the Cady School and CJTS as a result of Ms. Goodwine's complaint did not constitute a retaliatory adverse employment action.

Furthermore, there is no evidence whatsoever that Ms. Gavey's review of Ms. Goodwine's grievances prejudiced Ms. Goodwine in any way. Ms. Goodwine herself suggests that Ms. Gavey's involvement in the review of her grievances was not exceptional, and was consistent with DCF practices. *See* Pls.' Local R. 56(a)(2) Statement [doc. # 99-3] ¶ 62.[12] The only other specific harm alleged by Ms. Goodwine – not receiving responses to emails, *see* Goodwine Aff. [doc # 99-2] ¶ 29 – is one of the "minor annoyances that often take place at work," and as such, it is not actionable under Title VII's anti-retaliation provision. *Burlington Northern*, 548 U.S. at 68 (explaining that "normally petty slights, minor annoyances, and simple lack of good manners" will not "deter victims of discrimination from complaining to the EEOC, the courts, and their employers" (citation and quotation marks omitted)).

Second, Ms. Goodwine has not argued – let alone offered any evidence – that the individual Defendants took their allegedly retaliatory actions because Ms. Goodwine engaged in

_____

[12] Defendants stated that "Ms. Perez frequently receives complaints about HR investigations and cannot practically reassign hearing officers each time she receives an unsubstantiated complaint of bias or conflict of interest; she makes reassignments of hearing officers only when presented with facts that support a conclusion that a hearing officer may have an actual conflict of interest." Defs.' Local R. 56(a)(1) Statement [doc. # 86-2] ¶ 62. Plaintiffs replied: "DENIED as to lack of duty to reassign officers. No employee of DCF should have the right to judge him or herself. This claim by Defendants establishes that DCF maintained a pattern and practice of allowing managers and supervisors to act in the event of conflicts of interest and to judge their own prior actions in relation to other employees . . . ." Pls.' Local R. 56(a)(2) Statement [doc. # 99-3] ¶ 62.

activity protected by a federal statute or constitutional provision other than Title VII, such as the First Amendment. *See, e.g.*, *Ezekwo v. New York City Health & Hosps. Corp.*, 940 F.2d 775, 781 (2d Cir. 1991) (observing that employee complaints that "[are] personal in nature and generally related to [the employee's] own situation" do not address "matters of public concern" and hence are not protected activity under the First Amendment). Therefore, there is no basis for Ms. Goodwine to bring a retaliation claim under § 1983. In any case, Ms. Goodwine's failure to present evidence from which a reasonable jury could conclude that she suffered an adverse employment action according to the standard for Title VII retaliation claims would also doom a retaliation claim brought pursuant to § 1983. *See, e.g.*, *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 227 (2d Cir. 2006) (noting that the Second Circuit's standard for finding an adverse employment action in the First Amendment retaliation context "has always been the equivalent to the standard set forth [for Title VII retaliation claims] in *Burlington Northern*").

Thus, to the extent that the Complaint can be construed to contain a claim that Defendants unlawfully retaliated against Ms. Goodwine, that claim too would fail because there is no evidence from which a reasonable jury could conclude that any of the Defendants retaliated against Ms. Goodwine in violation of Title VII or § 1983.

## V.

In addition to her federal claims, Ms. Goodwine charges Mr. Bendig with trespass against the person, a state common law tort. Supplemental or pendent jurisdiction is a matter of discretion, not of right. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 715-26 (1966). A court may decline to exercise supplemental jurisdiction when the court has dismissed all claims over which it has original jurisdiction. *See* 28 U.S.C. § 1367(c)(3); *see, e.g.*, *Roncallo v. Sikorsky Aircraft Corp.*, No. 3:09cv126 (MRK), 2010 WL 4365764, at *11 (D. Conn. Oct. 22,

2010).  Because the Court grants Defendants' motion for summary judgment with regard to all of Plaintiffs' federal claims, the Court declines to exercise supplemental jurisdiction over Ms. Goodwine's remaining state law claim.  Should she wish to do so, Ms. Goodwine is free to raise her state law claim against Mr. Bendig in the Connecticut state courts.

**VI.**

For the foregoing reasons, Defendants' Motion for Summary Judgment [doc. # 86] is GRANTED.  Ms. Goodwine's state law claim against Mr. Bendig is DISMISSED without prejudice to renewal in state court.  **The Clerk is directed to enter judgment for Defendants on Plaintiffs' Title VII and § 1983 claims and to close this file.**

IT IS SO ORDERED.

/s/]        _____Mark R. Kravitz_____
United States District Judge

**Dated at New Haven, Connecticut:  January 14, 2011.**